# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

**IN RE:**

**PAVEMENT MARKINGS
NORTHWEST, INC.,**

**Case No. 17-01071-TLM**

    **Debtor.**

**Chapter 7**

## MEMORANDUM OF DECISION

On August 15, 2017, following an unsuccessful attempt at reorganizing its business under state law, Pavement Markings Northwest, Inc., ("Pavement" or "Debtor") filed a petition for relief under chapter 11.[1]  On November 20, 2017, the Court converted the case to chapter 7 pursuant to § 1112(b).  Doc. No. 104.  A chapter 7 trustee, Noah Hillen ("Trustee"), was appointed.

The issues presently before the Court arise from the request of a state court-appointed receiver, Steven G. Neighbors ("Neighbors") of Strategic & Operational Solutions, Inc. ("SOS"), for allowance of compensation under § 543(c)(2),[2] and for allowance of administrative expense treatment under § 503(b)(3)(E) and § 503(b)(4).[3]  *See* Doc. No. 154 ("Application").  Trustee objected to the Application.  Doc. No. 171 ("Objection").  Neighbors' response to the Objection, Doc. No. 187 ("Response"), stated "Receiver respectfully requests that this Court accept the attached report as being submitted in accordance with 11 U.S.C. §§ 503(b)(3)(E), 503(b)(4), and 543(b) and Federal Rules of Bankruptcy Procedure 2016(a) and 6002(a)."  *Id.* at 1; *see also id.* at

MEMORANDUM OF DECISION - 1

Attachment A: "Receiver's Report #6 for Pavement Markings Northwest, Inc. (an Idaho

Corporation) Final Report" (the "Final Report").[4]

This Application requested allowance of "$20,124.52 incurred by custodian

[Receiver], and $10,214.90 incurred by the custodian's attorneys." Doc. No. 154 at 3.

Thus, a total of $30,303.27 was requested. *Id*. Trustee's Objection acknowledged

§ 543(c)(2) provides for reasonable compensation related to certain post-petition duties

imposed on a custodian under §§ 543(a) and (b), but argued that § 543(b) and Rule 6002

require delivery of any property held by the custodian to the Trustee and that the

custodian file an accounting, and that neither requirement had been satisfied. Trustee

additionally objected to allowance of any prepetition compensation based on lack of

information or evidence that the services actually benefitted the estate.

Neighbors' Response changed the amounts requested from those in the

Application. Under the Response, Neighbors sought $24,407.52 for "time" he and SOS

staff expended and for SOS' costs, and also sought $17,437.40 for SOS' attorneys, for a

total of $41,844.92. Doc. No. 187 at 1–2. Neighbors then filed an additional submission

on May 4, 2018, which he characterized as "Supplemental Information re: Response to

Trustee's Objection re: Expenses and Fees." Doc. No. 193. The supplement requests the

same amounts as set forth in the Response and attaches several "Receivership Reports."

The Application, Objection and Response were initially heard on May 21, 2018,

and the Court set the matters over for an evidentiary hearing on August 16, 2018.

Another supplement was filed by Neighbors on July 20, 2018. Doc. No. 208.[5] That

document contends "the total *owed* the Receivership for its administration as of the filing

MEMORANDUM OF DECISION - 2

of the Chapter 11 Bankruptcy [*i.e.*, Aug. 15, 2017] was $17,894." Doc. No. 208 at 12 (emphasis added). It also states the total *billed* during the receivership up to the bankruptcy date was $54,342. *Id.*[6] It further reports Pavement paid $38,552 during the receivership period ($10,449 toward legal fees and $28,103 toward the time and expenses of SOS and Neighbors) resulting in a net "outstanding" amount owed of $15,790.[7] *Id.* This figure is different from the figure found in Debtor's list of the 20 largest unsecured creditors which disclosed SOS as holding an unpaid $13,708.22 claim for services as of the date of filing. Doc. No. 3 at 2. That form was later amended but did not change SOS' $13,708.22 claim. Doc. No. 20.

Due to illness of counsel, the referenced August hearing was vacated and continued to October 23, 2018. On October 11, 2018, Neighbors filed yet another "supplement" to the previously filed materials. Doc. No. 221. The supplement asserts that, prior to the receivership, SOS had billed and Pavement had paid $10,856[8] on April 28, 2017, and $2,081[9] on May 22, 2017, for a total pre-receivership payment of $12,938.[10] *Id.* at 2.

At the hearing on October 23, 2018, Gregory Harp ("Harp"), the owner of Pavement, testified. Issues relating to the inability of Neighbors to present a cogent record arose, and the Court determined that the hearing would need to be halted and continued, though it ordered Harp's testimony preserved. Doc. No. 222 (minute entry).

In May 2019, Neighbors/SOS filed the supplemental briefing required by the Court, Doc. No. 232, and Neighbors' affidavit in support of that brief, Doc. No. 231. Trustee responded with his brief. Doc. No. 237. Hearing was set for October 22, 2019.

MEMORANDUM OF DECISION - 3

On that date, Trustee and Neighbors/SOS appeared through counsel. Neighbors was examined, and Exhibits 103, 104, 105 and 109 were admitted. The parties rested and, after oral argument, the Court took the Application and Objection under advisement. Doc. No. 242 (minute entry). This Decision constitutes the Court's findings of fact and conclusions of law under Rules 7052 and 9014.

**ISSUES PRESENTED**

The fundamental questions are easy to identify: (1) is Neighbors (and/or SOS) a "custodian" under the Code; (2) if so, have the Code's prerequisites to a custodian obtaining allowance of compensation been satisfied; and (3) is there a competent evidentiary record to support the amount of such compensation?[11]

To address these issues, the Court has considered the evidence presented at the hearings held on the Application and Objection on October 22, 2019, during which Neighbors testified, and on October 23, 2018, during which Harp testified. It has considered carefully the weight to be given such testimony. It has also carefully reviewed Exhibits 103, 104, 105 and 109, which were the only exhibits out of the eighteen marked exhibits that were ultimately admitted into evidence. And, for context (but not as evidence except to the extent subject to actual corroborating testimony at hearing), the Court has considered the *seriatim* filings by Neighbors/SOS including those mentioned above.

**FACTUAL BACKGROUND**

In 1971, Neighbors founded what was to become Pavement, a business involved in highway and roadway striping, and he incorporated it in 1974. He testified that he sold

Pavement to Harp in 2001.[12]  Harp had been employed by Eternaline, another of

Neighbors' businesses in the same field.  Harp treated Neighbors as a sort of "mentor"

and relied on his help in connection with Pavement's business.

In approximately 2013–2014, Harp moved away from the Boise, Idaho area and

allowed other individuals to handle Pavement's daily operations.  In late 2016, Harp

became concerned about Pavement's financial condition and operations, and he contacted

Neighbors to review the company's books and provide advice.  Neighbors—who

characterizes himself as a "turnaround consultant" and "forensic financial analyst" as

well as at times a "chief reorganization officer" or "CRO"—agreed to do so.[13]

Neighbors' evaluation of Pavement's 2013–2016 financial information led him to

the conclusion that Pavement was in a serious negative equity and negative cash flow

position.[14]  He so advised Harp, and he also referred Harp to legal counsel to address a

receivership or bankruptcy reorganization.

In April 2017, Pavement commenced a voluntary receivership action in the Fourth

Judicial District Court of the State of Idaho, in and for Ada County (the "State District

Court"), in Case No. CV01-17-07925 (the "Receivership Case").  Pavement was

represented therein by the same firm that would later file the August 15, 2017 chapter 11

bankruptcy petition as counsel for Debtor.

The receivership petition was filed April 27, 2017, and indicates that "Steven G.

Neighbors of Strategic & Operational Solutions, Inc." was the "Proposed Receiver."[15]

Pavement relied on Idaho Code § 8-601, *et seq.*, as authority for the requested

appointment of the "Receiver."  On May 25, 2017, the State District Court entered an

order appointing "Steven Neighbors of Strategic & Operational Solutions" as the

Receiver.  *See* Ex. 105 at 25–28.[16]  The order, as presented in Ex. 105, does not contain a

State District Court filing stamp but has one indicating it was signed by the district judge

on May 24, 2017, and a certificate of mailing by that court's clerk dated May 25, 2018.

As noted, this order identifies "Steven G. Neighbors **of [SOS]**" as the Receiver.

At one point, the order states that SOS "is suitable to act as receiver in this matter." *Id.* at

26.  But the decretal part of the order states that the appointment is "contingent on the

condition that Receiver does not favor **his own** creditor interest over that of any other

creditor's interest" before stating that "Letters of Receivership from this court shall be

issued to Steven Neighbors of [SOS]." *Id.* (emphasis added).[17]  The Court determines

from the State District Court's caveat regarding potential conflict that Neighbors—

individually—was the Receiver.[18]

Within 30 days of the receivership order, Neighbors was to provide an opening

balance sheet with details and schedules (a "Receiver's Balance Sheet") describing

Pavement's condition, and by the same date file a "go-forward plan that the Receiver

deems to be in the best interest . . . and welfare of [Pavement], its creditors and other

stakeholders[.]"

Neighbors testified that, in his view, Idaho state receivership law was "weak"

because it lacked a stay of creditor action while the receivership went forward, and he

opined that this defect made it likely that Pavement would have to file a chapter 11.  He

also stated that there were positive features to Pavement's business as it entered into the

MEMORANDUM OF DECISION - 6

receivership (*e.g.*, $4 million of work on the books; a good crew; a good reputation) but that $400,000 to $600,000 of working capital would be needed.

Neighbors' Receivership Report #2, Ex. 104, attempted to create a more accurate balance sheet as of December 31, 2016. *Id*. at 2–3 and Attachment 4. Neighbors concluded that Pavement's balance sheet reflected roughly a negative $2 million value, that liquidation would not generate enough to satisfy secured creditors in full, and that an "operational element" would be needed to fully pay those creditors and generate something for unsecured creditors. *Id*. at 3–4. This operational element was the "Go-Forward Plan."

Following the provision of such financial information and plan, Neighbors was to "attempt to gain the cooperation of the creditors and stakeholders" regarding the plan. The Receiver was also required to provide an annual "accounting of the estate under the Receiver's control[.]" *See* Ex. 104.

## A.  Neighbors/SOS Compensation

The approach taken to prove reasonable compensation—both in the manner by which Neighbors and Pavement allegedly addressed how Neighbors and SOS would be paid, and by which Neighbors attempted to establish a credible evidentiary record to support such payment—was ineffective. Part of this is due to inconsistent language such as "cap," "flat fee," "fixed fee," "costs fee" and the like, and lack of coherent and consistent explanation of the terms or conditions of the engagement. Part is due to the inconsistencies in the several documents utilized by Neighbors to establish the amount of

the claimed compensation.  And part is due to the difficulties Neighbors' counsel had in presenting an adequate evidentiary record in support of the Application.

The financial arrangements for Neighbors/SOS' work were addressed several times, in various submissions (*e.g.*, the "Receiver's reports") and at the two hearings, but not clearly.  From Neighbors' testimony, the arrangement was to include the following: (1) Neighbors' personal work would be charged at a rate of $225/hour; (2)  Neighbors would "cap" his fees from the inception of the receivership engagement to the date the Go-Forward Plan was filed at $18,750; (3) Neighbors would bill his time at the indicated rate on a monthly basis, but he would only be paid a maximum of $3,000/month in fees[19] and would "roll" any unpaid balance forward; and (4) Neighbors would seek the unpaid balances "at the end."

No written agreement between Neighbors and Pavement regarding compensation was admitted into evidence, nor is it clear that there was ever any disclosure of any such arrangement to, or approval by, the State District Court.

"Receiver's Report #3/Receiver's Go-Forward Plan," Ex. 105, asserts the following in regard to Neighbors' "fee":

(a) The Receiver's "costs fee" would be set at $18,750 for all due diligence and effort from April 30, 2017, up to the submittal of the Go-Forward Plan.  (That Plan is dated June 23, 2017.)  This was also variously referred to as a "flat fee" or a "fee cap."

MEMORANDUM OF DECISION - 8

(b)  Neighbors would receive $3,000/month starting on July 1, 2017.[20]  If circumstances required more than that amount to be actually paid, Neighbors was to justify the same to the State District Court.

(c)  There would be percentage fees for orchestrating and managing the sale of the company or its assets.[21]

(d)  Neighbors' (*i.e.*, SOS's) support staff would be billed at $58/hour, and any monthly cost for the same that exceeded $1,500 would need to be approved by the State District Court.

(e)  Neighbors could engage professionals as he deemed necessary, with the costs thereof to be reported to the State District Court and any single cost above $5,000 would be subject to State District Court approval.

(f)  Neighbors' out of pocket expenses, such as copies or filing fees, would be reimbursed.

(g)  Monthly operating reports were to include an accounting of the Receiver's fees and costs.

Ex. 105 at 7.  These provisions are also repeated in the Go-Forward Plan at page 6.

"Receivership Report #5 through June 30, 2017," Ex. 109, also explains the fee structure, although with some differences:

> The costs for me [*i.e.*, Neighbors] through the filing of the Receiver's Plan (June 23) is capped at $18,750.  Any excess Receiver's fee and costs will be rolled over into the following month.  Each month, my time and that of any administrative help I need to interact with creditors and create the Monthly Reports will be charged and reported.  During the Receivership, my pay each month will be capped at $3,000 for my time and $1,500 for administrative help, with any excess rolling into the next month.

MEMORANDUM OF DECISION - 9

*Id*. at 2–3.[22]

The Receivership Order did not address compensation, no "Letters of Receivership" were introduced into evidence, and there is nothing in the record that indicates any State District Court approval of any compensation terms or structure.

### 1. Fees Claimed

The Application, Doc. No. 154, asks for "custodian fees" for Neighbors and SOS of $20,124.52 under § 543(c)(2) and § 503(b)(3)(E). The Application also seeks allowance of custodian's attorneys' fees and costs of $10,214.90. *Id*. at 2–3 (citing § 503(b)(4)). Attached to the Application as Exhibit B are SOS invoices:

| Inv. # | Dates | Total Amt. | Payments | Balance Due |
|--------|-------|-----------|----------|-------------|
| #2960 | 6/6/17 to 6/27/17 | $11,868.75 | -$11,338.75 | $530.00[23] |
| #2997 | 7/5/17 to 7/31/17 | $695.22 | --- | $695.22 |
| #3030 | 7/5/17 to 7/31/17 | $11,925.00 | --- | $11,925.00 |
| #3061 | 8/7/17 to 8/15/17 | $4,350.25 | --- | $4,350.25 |
| #3272 | 8/16/17 to 8/31/17 | $2,030.05 | --- | $2,030.05 |
| #3099 | 9/5/17 to 9/30/17 | $506.50 | --- | $506.50 |
| #3235 | 10/31/17 | $97.50 | --- | $97.50 |
| #3182 | 11/7/17 to 11/30/17 | $8,926.75 | --- | $8,926.75 |

*Id*. at 15–25. The suggested total balance due to SOS (from June 6, 2017 to November 30, 2017) based on these invoices was $29,061.27. *Id*. at 25.[24] These SOS fees/costs are higher than the $20,124.52 figure in the Application.[25]

### 2. Attorney's Fees Claimed

The Application also shows invoices or billings from The Richards Firm (attorney Jace Richards):

| Inv. # | Dates | Total Amt. | Payments | Balance Due |
|--------|-------|-----------|----------|-------------|

MEMORANDUM OF DECISION - 10

| #684 | 8/1/17 to 8/31/17 | $1,683.50 | --- | $1,683.50 |
| #693 | 9/1/17 to 9/25/17 | $448.50 | --- | $448.50 |
| #700 | 10/31/17 | $97.50 | --- | $97.50 |
| #708 | 11/3/17 to 11/30/17 | $6,743.40 | --- | $6,743.40 |

*Id.* at 26–32.  These invoices add up to $8,972.90.  (A "total amount due" of $8,972.90

also appears on each of the invoices.)  The Application then shows a single invoice from

Ysursa Law (attorney Mick Ysursa):

| #136 | 1/24/18 to 2/13/18 | $1,818.00 | -$576.00 | $1,242.00 |

*Id.* at 33 (a note indicates the $576.00 was not a payment but an amount held in trust).

Adding Richards' claim at $8,972.90 and Ysursa's at $1,242.00 result in a total for the

attorneys of $10,214.90, which matches the claimed amount for SOS' attorney expenses

in the Application.

However, none of these attorneys' invoices were admitted.  And there was no

testimony or other evidence submitted as to the work performed by such attorneys or the

reasonableness thereof.

### 3.    Additional Evidence

Neighbors testified as to a 3-page "Receiver's Fees & Cost Report" attached to

"Receiver's Report #5 through June 30, 2017."  Ex. 109.[26]  In it, Neighbors claims a total

owed of $18,168.75 for his personal time from May 1, 2017 through June 23, 2017, this

last date being the filing of the Go-Forward Plan.  He then shows a total of $13,387.50

owed for personal services from June 26, 2017, through July 31, 2017.  This document

also summarizes work done by SOS administrative staff, with employee "BN" billing

$3,552.50 between May 9, 2017, and July 13, 2017, and employee "TE" billing $377.00 between May 17, 2017, and July 17, 2017.

As noted earlier, Receiver's Report #6, the so-called "Final Report" was filed with the Court as Doc. No. 187. Exhibit 114, which contains the first 14 pages of that document, was never admitted. However, the Court notes, simply by way of background, Neighbors' assertions therein:

> As of this writing, outstanding amounts due and payable are as follows, which are supported by the invoices attached here as Exhibit 1:

| | | |
|---|---|---|
| SOS (S. Neighbors) | $22,343.00 | |
| SOS (support staff and costs) | $2,064.62 | $24,407.62 |
| | | |
| Jace A. Richards, Chtd. | $16,195.40 | |
| Ysursa Law | $1,242.00 | $17,437.40 |
| TOTAL | | $41,845.02 |

Doc. No. 187 at 14. The referenced "Exhibit 1" to this report were SOS invoices from June 6, 2017, through April 13, 2018 (*id*. at 16–27); Richards' claimed amounts from August 1, 2017, through April 13, 2018 (*id*. at 28–36); and Ysursa's claimed amounts from January 14, 2018, through February 13, 2018 (*id*. at 37).[27]

After the parties rested at the October 22, 2019 hearing, counsel[28] made closing arguments. In so doing, counsel for Neighbors/SOS summarized the fees and compensation sought:

> For the pre-receivership period up to April 30, 2017: $12,960.00.[29]

> For the period from May 1, 2017, to the plan's filing on June 23, 2017: $18,168.75.[30]

> For the post-plan period of June 24, 2017, to July 31, 2017: $13,387.50.

MEMORANDUM OF DECISION - 12

For the period from August 1, 2017, to the August 15, 2017 petition date: $4,000.[31]

These amounts—totaling $48,516.25—were characterized by counsel as "earned *but not yet paid*."  Counsel went on to state that a total of $50,549.95 had previously *been paid* to and received by SOS.  Of that amount, he indicated that $31,720 was paid toward fees and costs incurred during the periods of time summarized immediately above, *i.e.*, through the date of the chapter 11 filing.[32]  Counsel did not clarify where or to what the balance ($18,829.95) was applied.

In short, this closing was difficult to follow.  It was untethered to the evidence, with no reference to any of the four admitted exhibits or to directly applicable testimony.  However, counsel was very clear in his ultimate assertion that the *only* amount Neighbors/SOS requests be allowed by the Court is $18,162.82 for the prebankruptcy periods.[33]

No request or argument was made as to allowance of any other amounts.  And no argument was made, nor evidence discussed, as to any of the other claims that were asserted in the underlying Application or other documents filed by Neighbors.

## DISCUSSION AND DISPOSITION

### A.    Custodians

The Application seeks allowance of custodian's fees and costs under § 543(c)(2).  Doc. No. 154 at 1.  The Code defines custodian as a "receiver or trustee *of any property of the debtor*, appointed in a case or proceeding not under this title[.]"  *See* § 101(11)(A)

(emphasis added).  The Bankruptcy Appellate Panel articulated the background of the

term custodian as set forth in § 101(11):

> The legislative history of the definition indicates that Congress intended the term "custodian" to encompass a variety of prepetition agents who have taken charge of a debtor's assets.  *Matter of Cash Currency Exchange, Inc.*, 762 F.2d 542, 553 (7th Cir. 1985), *cert. denied Fryzel v. Cash Currency Exchange, Inc.*, 474 U.S. 904, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985); *In re Redman Oil Co., Inc.*, 95 B.R. 516, 520 (Bankr. S.D. Ohio 1988).  Senate Report No. 989 illustrates that the categories of custodians are descriptive rather than exhaustive:
>
> > Paragraph [11] defines "custodian."  There is no similar definition in current law.  It is designed to facilitate drafting, and means a prepetition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or a liquidator or administrator of the debtor's property.  The definition of custodian to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles.  The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee.  *Redman Oil*, 95 B.R. at 520 (quoting H.R. No. 95-595, 95th Cong. 1st Sess. 310 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6267); *see also Cash Currency*, 762 F.2d at 553.

*Bakonyi v. Boardroom Info. Sys. (In re Quality Laser Works)*, 211 B.R. 936, 943 (9th Cir.

BAP 1997).

More recently, another court explained:

> Neither section [503(b)(3)(E) or 543(c)(2)] applies to custodians generally, but rather, each appear limited to those custodians who meet the constraints of section 543(a).  Put another way, neither section creates a prioritized claim procedure for past custodians, only those in custody of qualifying property on the petition date.  Such past custodians are creditors and, while they may be owed monies for their service, unless such past custodians remain custodians within the confines of section 543(a) on the petition date, they may not avail themselves of either sections 503(b)(3)(E) or 543(c)(2).  *Am. Motor Club, Inc.*, 125 B.R. at 83 ("[A] custodian may have its claim paid as

MEMORANDUM OF DECISION - 14

> an administrative expense *only if it was administering the estate when the*
> *bankruptcy petition is filed*.") (emphasis added).

*In re Montemurro*, 581 B.R. 565, 576–77 (Bankr. N.D. Ill. 2018).  The court thus

emphasized that § 503 applies to custodians "superseded under section 543 of this title"

and this means those custodians who had been in possession, custody, or control of

property of the debtor, proceeds, products, offspring, rents, or profits of such property on

the petition date.  *Id.* at 573–74.

The Code definition focuses on (A) the receiver or trustee "of any of the property

of the debtor" appointed in a case or proceeding not under Title 11; (B) an assignee under

a general assignment for the benefit of creditors; and (C) a trustee, receiver or agent "that

is appointed or authorized to take charge of property of the debtor" to enforce a lien

against the same or to generally administer the same for the benefit of creditors.  Section

101(11).  An example of such a custodian was addressed in *In re Ute Lake Ranch, Inc.*,

2016 WL 6472043 (Bankr. D. Colo. Sept. 14, 2016).  There the state court order

appointed Cordes & Company, Inc. ("Cordes") under Colorado state law as a receiver

and custodian.  As summarized:

> The Receiver Order gave Cordes broad powers, including the power to take
> possession of all of Debtors assets, to "undertake the day-to-day operation,
> management, and control" of the Debtors and the power to "act on behalf of
> [Debtors] without further approval, input and/or interference from the
> officers, directors, or shareholders[.]  . . .  Essentially, Cordes replaced the
> Debtors' management and has been managing the Debtors' operations, with
> State Court supervision, since entry of the Receiver Order.

*Id.* at *1.  Cordes caused the chapter 11 petitions to be filed.  *Id.* at *2.  However, Cordes

disputed it was a custodian subject to the requirements of § 543.  The court, relying *inter*

MEMORANDUM OF DECISION - 15

*alia* on *Cash Currency Exchange* and the legislative history there discussed, found "little doubt that Cordes, in its role as the State Court-appointed receiver and custodian of Debtors qualifies as a 'custodian' under the Code's definition of that term in § 101(11)." *Id.* at *2–3.[34] Given the state court's terms of appointment, Cordes qualified as a custodian. Thus, while case law supports a broad definition of custodian, it is clear that there still must be a degree of actual possession and control over property of the debtor or the administration of the debtor.

### 1.    Neighbors' Role

On October 22, 2019, Neighbors testified that when Harp first contacted him, he acted as a "consultant" to Pavement. Pavement continued in operation under Harp's control. Even after Neighbors recommended the receivership and it was initiated in state court, nothing in the evidence indicates Neighbors ever received possession or control of Pavement's assets.[35]

Neighbors testified that in May 2017, he dealt with creditors, worked on Pavement's contract bids, sought to obtain appraisals, and conducted lien and title searches. He said nothing about taking possession or control of Pavements' assets. In the "Supplement to Receiver's Final Report," Doc. No. 208-1 filed July 20, 2018, he explained:

> 1) During the voluntary, operating Receivership, the owner of [Pavement] remained in control of all assets and all financial distributions. Though the Receiver took constructive control, actual physical control of all assets in their entirety remained at all times with [Pavement]. No assets were physically removed from [Pavement]. No [Pavement] receipts were received by me directly nor were any payments of [Pavement] issued by me directly. Instead, the Receiver reviewed the management of assets by

MEMORANDUM OF DECISION - 16

[Pavement] and reported that to the Idaho State Court that ordered the Receivership.

2) Between the Receivership and Chapter 7, there was an intervening Chapter 11, where the owner, Greg Harp, was the Debtor in Possession and had full control of all assets, only now without the Receiver's oversight. There was no break in his control of those assets from the Receivership to the Chapter 11 Bankruptcy. All assets subject to the Receivership flowed into the Chapter 11 bankruptcy estate.

3) . . . Based on the counsel of several attorneys, I limited my involvement in [Pavement's] operations, management, and financial matters while in Chapter 11 to solely assist [Pavement], at their request and pro bono, with understanding the management tools and reporting templates that I created during the Receivership. I did this only when they requested, and my assistance was pro bono. I took <u>NO physical custody</u> of [Pavement] assets prior to the Receivership, during the Receivership, or during the Chapter 11.

*Id.* at 6.[36]  It continues:

The Receivership was filed April 27, 2017, and ordered by the state Court on May 25, 2017. Though the Receiver had constructive control of [Pavement], all direct control of all [Pavement] assets was handled through the owner of [Pavement], Mr. Harp. The Receivership was voluntary with the company continuing to operate with the owner of the company managing the company for the benefit of the creditors. The Receiver installed the necessary controls for accurate monthly reports, installed reasonable project management systems, communicated with all known creditors and suppliers, and fulfilled the reporting requirements as set forth in the Go-Forward Plan. The Receiver issued no checks nor did the Receiver receive any money due [Pavement]. All funds were received by [Pavement] directly and all payments from [Pavement] were made by Mr. Harp. Mr. Harp signed all checks and wires. The Receiver signed no checks or disbursements of any kind from [Pavement]. Think of the Receivership as a "debtor in possession" scenario. Again, the Receivership was a voluntary, operating Receivership with the owner managing the assets under the supervision and with the assistance of the Receiver.

The Receivership essentially ended on August 15, 2017, by a forced Chapter 11 bankruptcy petition. At the time of converting from a Receivership to a Chapter 11 bankruptcy, all assets and their derivatives were under the control of Mr. Harp who was running [Pavement] as the Receivership debtor in possession with the oversight and reporting

MEMORANDUM OF DECISION - 17

requirements put upon the Receiver.  With the Chapter 11 filing, those assets of the Receivership then remained under the actual and constructive control of Mr. Harp then as the Chapter 11 Debtor in Possession.  The supervision, oversight, and creditor interaction of the Receiver was fully dismissed.  The Receiver never took physical control of any [Pavement] assets at any time during the Receivership or during the Chapter 11 period.  The Receiver did have a binder of [Pavement's] financial records, which included tax returns.  That binder was returned to [Pavement] with the filing of the Chapter 11.  The Receiver, thereafter, had no physical or constructive control – no possession of any of [Pavement's] assets.  The change was that the Receiver simply ceased of any financial oversight of [Pavement] and was stayed from any further action with [Pavement].

*Id.* at 15–16.  He again summarized, with apparent reference to the language of

§ 543(b)(1) and (2):

There was never any [Pavement] property, or proceeds, product, offspring, rents, or profits of such property, for which the Receiver ever took direct possession during the Receivership, the Chapter 11, or the Chapter 7 periods.

*Id.* at 17.  He then stated:

All financial accounting, including but not limited to all cash, accounts receivables, payments of any form, checks, bank statements, contract documents, and software (Construction Partners) were physically held at [Pavement] and in the direct control and management of Mr. Harp during the entire life of the Receivership.

*Id.* at 17.

Similarly, Neighbor's Prehearing Memorandum, Doc. No. 219, states:

2.      The receivership was an operating, receivership.  Not a liquidating one; therefore Receiver took *constructive* control of the then-received entity, meaning Receiver did not physically move, e.g., PMNW's heavy equipment, other vehicles, or office furniture somewhere other than PMNW's offices and yard on Henry Street in Boise, Idaho.  Instead, Receiver came in as a manager of sorts responsible for guiding the concern's activities, financial and otherwise.  As is standard protocol for SOS receiverships, Receiver and PMNW opened a receivership account with Wells Fargo Bank (the "***Receivership Account***"), and PMNW moved its financial operations from its previous accounts to the Receivership Account.  PMNW continued to

make deposits to and payments from the Receivership Account as it did pre-Receivership, except Receiver then had full transparency into and oversight of PMNW's financial activities.

3.      The Receivership Account and its contents, along with PMNW's other assets, fed directly into PMNW's bankruptcy estate upon filing its Chapter 11 petition and, later, into the Chapter 7 bankruptcy estate upon conversion; <u>therefore</u>, Receiver had no PMNW property to convey to the Chapter 7 Trustee.

Doc. No. 219 at 1–2 (emphasis in original).[37]

Neighbors emphasized repeatedly and in numerous submissions that he and/or SOS never took possession or control of any property of Pavement and that, at all times, Pavement (under Harp's management) operated the business.  Though titled a "receiver" in the State District Court's order, the duties assigned to and imposed on Neighbors under that order are unlike those of a custodian as contemplated by the Code.  The State District Court order required Neighbors to evaluate Pavement's situation and provide the court within 30 days an opening balance sheet with appropriate details and schedules, and also within that time provide the court with a "go-forward plan" that Neighbors "deems to be in the best interest and welfare" of Pavement and its creditor, after which Neighbors was to attempt to gain the cooperation of the creditors and other stakeholders on such a plan, or to bring the matter back to the court.  Ex. 105 at 27.  As Neighbors emphasized in his Supplement to Receiver's Final Report, throughout the Receivership period Pavement "remained in control of all its assets and all financial distributions."  Neighbors characterized his "control" of Pavement as "constructive" but insisted that all "actual physical control of all assets in their entirety remained at all times with [Pavement]."

Indeed, it was Hart, as president of Pavement—not Neighbors as receiver—that authorized and initiated the chapter 11 bankruptcy filing.

Neighbors' role started out as a "consultant" (or variously described as financial analyst, CRO, or turnaround consultant). The evidence indicates it continued in very much that same vein throughout. Neighbors' submissions emphasize that Harp remained in control, and handled all assets and property, and that Neighbors had no custody or control over the same. Whether casting a turnaround consultant as a state court "receiver" was a wise strategy is not the question. Given that Neighbors seeks compensation for himself and for his SOS staff and his counsel, he must prove he was a superseded receiver and a custodian within the ambit of the Code. Under the authorities, and given the state of the evidentiary record produced by Neighbors in support of the Application, he failed to sustain that burden. The Court finds and concludes on this record that Neighbors was not a custodian under § 101(11) and § 543(a), and therefore is not entitled to allowance of an administrative expense under § 503(b)(3)(E).

This conclusion moots questions that manifestly exist on this record as to the amount of compensation or cost reimbursement Neighbors actually seeks. However, if the Court were required to address the amount of compensation under § 503(b)(3)(E), it would find that the burden placed on the applicant to establish an amount and a supporting record was not sustained.

In addition, concluding Neighbors was not a custodian as defined under the Code also impacts the requests for allowance of compensation for Neighbors/SOS' attorneys under § 503(b)(4). To the extent those requests were not already abandoned (when

MEMORANDUM OF DECISION - 20

Neighbors' counsel in his closing argument limited the total amount sought by the

Application to $18,162.82), the denial of recovery for Neighbors on the foregoing

grounds eliminates any basis for counsels' compensation. *In re Stainless Sales Corp.*,

583 B.R. 717, 726 (Bankr. N.D. Ill 2018) (holding that a threshold for § 503(b)(4)

compensation is the existence of a § 503(b)(3) entity with allowable expenses) (citing *In

re 29 Brooklyn Ave., LLC*, 548 B.R. 642,651 (Bankr. E.D.N.Y. 2016)).

**CONCLUSION**

Based on the foregoing, the Court determines that the Application will be

disallowed. An appropriate order will be entered.

DATED: January 31, 2020



—————————————————
TERRY L. MYERS
U.S. BANKRUPTCY JUDGE

---

¹ Unless otherwise indicated, statutory citations are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532, and Rule citations are to the Federal Rules of Bankruptcy Procedure.

² Section 543(c)(2) provides:

(c) The court, after notice and a hearing, shall—

. . .

(2) provide for payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian

³ Section 503(b) states:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

. . .

> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> . . .
>
> (E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian[.]
>
> . . .
>
> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

[4] SOS marked this Final Report as Ex. 114, but Ex. 114 was never admitted. The Court takes judicial notice of the Final Report, and the Supplement to Receiver's Final Report, Doc. No. 208 (the "Supplement"), under Fed. R. Evid. 201, solely as reflective of the assertions made by Neighbors/SOS. *See Hillen v. Specialized Loan Servicing, LLC (In re Leatham)*, 2017 WL 3704512, *2 (Bankr. D. Idaho Aug. 24, 2017) (judicial notice of the record allows the Court to establish that a filing occurred and on what date, should the same be relevant, but not to give evidentiary weight to what is asserted in such documents).

[5] This document, running 59 pages, is entitled "Supplement to Receiver's Final Report to Comply with 11 U.S.C. § 543 for Chapter 7 Proceedings re: Pavement Markings Northwest, Inc." For clarity, the Court will reference the ECF paginated numbers, not those on the document.

[6] Of that amount, $10,449 was claimed to have been legal costs, with the balance of $43,893 consisting of the time, expenses and costs incurred directly by Neighbors/SOS.

[7] Though this figure is different from the $17,894 first stated in that same document, Neighbors notes in a preceding narrative that $2,081 in time and $23 in expenses are also unpaid, which with the $15,790 results in a total of $17,894.

[8] Two checks were written on April 28, totaling $10,856.25 and were purported to be in payment of SOS invoices 2858, 2748 and 2867. *Id*. at 10.

[9] The May 22 check attached in support of this assertion was in the amount of $6,336.40. *Id*. at 12. Other sections of the supplement indicate $2,354 of that amount was for post-receivership services, but nothing explains the payment of the remaining $1,901.40. ($6,336.40 less $2,354 less $2,081 = $1,901.40).

[10] While the supplement states the total payment was $12,938, the figures asserted ($10,856 and $2,081) total $12,937. This appears to be caused by a lack of precision in referencing whole dollar amounts rather than actual payment amounts (*i.e.* $2,081 rather than $2,081.25) and then rounding the asserted total of $12,937.50 up to $12,938.

[11] The Court has jurisdiction over these questions. 28 U.S.C. § 1334; 28 U.S.C. § 157(a). The matter is a core proceeding. 28 U.S.C. § 157(b).

[12] References in various documents, including the Receivership Order discussed *infra*, indicate that 100% ownership of Pavement is actually held by the Gregory E. and Margaret M. Harp Trust and that Harp is the trustee of such trust as well as president of Pavement. The chapter 11 petition also reflects the same. *See* Doc. No. 1 at 5–6 (corporate resolution), and at 57 (list of equity security holders).

[13] In "Receivership Report #2," Ex. 104, Neighbors states that Harp hired a CFO/COO in early 2013 with the intent to sell the company to this individual within a few years; that Harp moved to Moscow, Idaho in early 2014 leaving this individual in control of the company; that Harp became concerned by the end of 2016 over the accuracy or adequacy of financial statements and information provided to him; and that in early 2017 Harp hired Neighbors/SOS and terminated that CFO/COO, with Harp again assuming control of Pavement. *Id.* at 3.

[14] At the October 22 hearing, Neighbors testified that during this period he "was acting as a consultant" for Pavement.

[15] The petition was marked as Exhibit 102 but not offered or admitted. The Court takes judicial notice of certain filings in the Receivership Case. *See U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992). The petition is inconsistent in its references to the Receiver. At times it appears to be Neighbors, an individual. *Id.* at 1 (identifying "Steven G. Neighbors **of** [SOS]" as the "proposed receiver." At other times, the reference appears to be to SOS. *Id.* at 2 (stating "The Proposed Receiver **is a corporate turnaround and restructuring firm**[.]").

[16] Neighbors/SOS' exhibits generally lack appropriate pagination. Some inappropriately contain multiple documents. This Decision attempts where possible to clarify the portions of admitted exhibits that are being referenced.

[17] Amended bankruptcy schedules filed on August 18, 2017, listed Neighbors as a prepetition creditor. *See* Doc. No. 18 (listing Neighbors as owed $216,219.18 on a promissory note and that such debt was incurred in 2016); Doc. No. 20 (listing Neighbors on the List of 20 Largest Unsecured Creditors). SOS was separately shown as a creditor. *See* Doc. No. 1 at 52 (listing SOS as holding a $13,708.22 unsecured claim incurred on July 31, 2017 for services rendered).

[18] However, if SOS was the Receiver, or if Neighbors and SOS were collectively the Receiver, the outcome of this litigation would be the same.

[19] That this $3,000/month was to include SOS' costs and expenses as well as Neighbors' time was not clear.

[20] Some testimony suggested the $3,000/month would commence at the outset of Neighbors/SOS' engagement as Receiver.

[21] Such "sale" or liquidation provisions were never implicated by events during the Receivership.

[22] This appears to be the first time a $1,500 cap on administrative help is disclosed.

[23] However, Ex. 109, Receivership Report #5 through June 30, 2017, contains an "Aged A/P By Vendor" report that shows SOS having an outstanding payable of $10,590.80 with a notation of a "last payment date" of 6/30/17.

[24] Exhibit 103 is a single SOS invoice, #2937, for the dates May 1, 2017 to May 31, 2017, in the amount of $11,764.00, on which no payments had been made. If added to the total of $29,061.27 shown above, the result is $40,825.27, a figure slightly more than double the $20,124.52 claimed in the Application.

[25] The invoices include payments of $8,972.90 in attorney fee expenses. If the $29,061.27 figure is reduced by $8,972.90, $20,088.37 remains, which is still inconsistent with the $20,124.52 requested.

[26] The "report" is "Attachment #6," and it can be found ten pages from the end of the Exhibit.

[27] This Court requires attorney services to be itemized and has consistently rejected "lumping" of multiple described services on a single day. *See Charterhouse Boise Downtown Props., LLC, v. Boise Tower Assocs., LLC, (In re Charterhouse Boise Downtown Props., LLC)*, 2010 WL 1049968 *4 (Bankr. D. Idaho Mar. 17, 2010); *Kilborn v. Haun (In re Haun)*, 396 B.R. 522, 532–33 (Bankr. D. Idaho 2008). Richards' invoices are replete with such lumping, and Ysursa's invoices have the same problem, even though certain of Ysursa's entries within a given day are marked "NC" apparently signaling "no charge."

[28] Paul Mangiantini acted as counsel for Neighbors/SOS at the October 22, 2019 hearing. Ysursa also appeared at this hearing but did not participate. Richards did not appear at that hearing.

[29] However, Neighbors stated in his "Final Report" that for the pre-receivership period: "I billed [Pavement] $10,856. [Pavement] paid me those sums at its attorney's office at the time of filing the Receivership papers with the Court." Doc. No. 208 at 9.

[30] Counsel emphasized that this amount was less than the "$18,750.00 cap" for that period.

[31] There was no attempt to tie this figure to any documentation, and it was simply an estimate made by Neighbors during his testimony.

[32] This suggests that $48,516.25 in earned but unpaid fees plus $50,549.95 in paid fees means total charges were $99,066.20.

[33] Despite several attempts to parse the argument and contentions, the Court cannot determine how Neighbors and/or his counsel arrive at this $18,162.82 figure.

[34] Characterizing "receivers" as those typically liquidating property and "custodians" as those given authority to manage the business of the debtor, the court found Cordes' appointment allowed him "the power to liquidate the Debtors' assets, to manage the Debtors' operations, and to generally act on behalf of the Debtors without interference from prior management." *Id.* at *3.

[35] Neighbors did use the word "control" in one context (*see infra* referencing "constructive" control). However, his several other assertions—itemized *infra*—belie a construction of this term as falling within the statutory definition.

[36] Citations are to the PACER pagination, not that of the internal documents.

[37] In the "Final Report" Neighbors described his function thusly: "Under the [Go-Forward] Plan, my role would essentially be to act as a CRO and fulfil of [*sic*] the administrative functions left vacant by the former CFO/COO, and Mr. Harp, having admittedly weak administrative skills, would be responsible for the field operations." Doc. No. 187 at 9. However, in that same document, he made two other, apparently inconsistent, statements. One was in the context of the Go-Forward Plan: "I relayed to the two banks that I would liquidate Pavement Markings if it could not service its debt as set forth in the Go-Forward Plan, but so long as Pavement Markings was executing the Plan, including its debt service obligations, I would operate Pavement Markings by managing the financial reports and decisions per the Plan, Mr. Harp would manage production, and together we would leverage our relationships with the customers." *Id.* at 10. He also stated that, at the time of the Chapter 11 filing: "I assisted Mr. Harp and/or [Debtor's counsel] as requested—transferring all assets, reports, financial templates, and information in my custody to the debtor in possession, Mr. Harp—except to the extent that my assistance was constrained by Bank of the West[.]" *Id.* at 11. The Court weighs these statements along with all others.